LESLIE M. CATON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Caton v. Commissioner
Docket No. 21971-92
United States Tax Court
T.C. Memo 1995-80; 1995 Tax Ct. Memo LEXIS 82; 69 T.C.M. (CCH) 1937; February 23, 1995, Filed *82 Decision will be entered for respondent for the taxable year 1987 and for petitioner for the taxable year 1988. For petitioner: Richard S. Karam. For respondent: Elizabeth Downs. PARKER
PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in petitioner's Federal income tax and additions to tax for the taxable years 1987 and 1988, as follows: Additions to Tax Sec. Sec. Sec.
Sec. Year
Deficiency
6653(a)(1)(A)
6653(a)(1)(B)
6653(a)(1)
6661(a)
1987
[1] $ 65,879
$ 3,294
[2]
-- $ 16,470
1988
11,294
--  --
$ 565
2,824
On brief, respondent conceded the deficiency and additions to tax for 1988. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years before the Court, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issues before the Court arise out of the interplay between petitioner's debt to his company's profit-sharing trust and his vested benefit in that profit-sharing *83 trust. Petitioner argues that his debt to his company's profit-sharing trust was discharged in 1987 by the running of the State statute of limitations and thereby constitutes discharge of indebtedness income excludable from income under section 108(a)(1)(B) due to his insolvency that year. Respondent contends that petitioner's debt to his company's profit-sharing trust was offset in 1987 against his vested benefit in that profit-sharing trust and that such offset constitutes a constructive distribution from the profit-sharing trust includable in his taxable income that year under section 402(a) and subject to the excess distributions tax under section 4980A. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. At the time the petition was filed in this case, Leslie M. Caton (petitioner) resided in Enid, Oklahoma. Prior to and during the years in issue, petitioner was president of Caton Lumber Co., Inc. (Caton Lumber). Caton Lumber was a closely held family business, established by petitioner's father. During the years at issue, petitioner and his brother, *84 Mac Caton, owned directly or indirectly all of the outstanding shares of Caton Lumber. [1]
The Profit-Sharing Trust
At all times relevant to this case, petitioner and his brother were the administrators and co-trustees of the Caton Lumber Co. Profit-Sharing Plan Trust [2] (the profit-sharing trust). The profit-sharing trust was a defined-contribution plan established to operate as a qualified plan described in section 401(a). Petitioner also was an employee of Caton Lumber and a participant in the profit-sharing plan. *85 The construction, validity, and administration of the profit-sharing trust indenture, the plan, and the adoption agreement are governed by the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93-406, 88 Stat. 829, and regulations issued thereunder, and, to the extent not so governed, by the laws of the State of Oklahoma. See supra note 2. Petitioner knew that, as an administrator and trustee of the trust, he had a duty to invest the funds of the trust in a prudent manner. As a trustee of the profit-sharing trust, petitioner was prohibited from entering into any "prohibited transaction" as defined by section 4975 or ERISA section 406, 88 Stat. 879. Also as a trustee, petitioner was required to keep accurate and detailed accounts of all receipts, disbursements, investments, and all other transactions involving the funds of the profit-sharing trust. As a fiduciary of the trust, petitioner was required to prepare and provide all reports required by regulations adopted by the Secretary of the Treasury and the Secretary of Labor. Also in his fiduciary capacity, petitioner was required to maintain records necessary to verify such reports, including vouchers, worksheets, *86 and receipts, for a period of not less than 6 years after the filing date of such reports. Over the years, the profit-sharing trust made loans to some Caton Lumber employees who were participants in the profit-sharing plan, including petitioner and his brother. As an administrator of the trust, petitioner approved each of the loans made by the profit-sharing trust. The loans were evidenced by demand notes. Each participant's loan balance, including accrued interest, was determined annually. Each participant's vested account balance was treated as collateral or security for his or her outstanding loan balance. [3] No lawsuit to collect on a loan from the profit-sharing trust was ever filed against an employee. Petitioner received loans and executed promissory notes payable on demand to the profit-sharing trust, with interest at the rate of 7.5 percent per annum, on the following *87 dates and in the principal amounts indicated: [4]
Date Principal Amount
4/30/74
$   3,000.00
4/14/78
12,000.00
6/15/78
20,217.58
4/09/79
22,217.31
4/20/79
27,217.31
6/07/79
200.00
8/07/79
52,997.90
10/08/79
8,500.00
4/10/80
10,000.00
4/15/82
9,000.00
Total
$ 165,350.10
The amounts of these loans, including unpaid accrued interest, were carried on the books of the profit-sharing trust as loans due from petitioner. During the years petitioner received the loans from the trust, his accrued benefit in the profit-sharing trust was fully vested. In addition to the loans made to participants in the trust, the profit-sharing trust made loans to third parties who were not Caton Lumber employees. The trust made several *88 loans to Larry Richey (Richey), a certified public accountant (C.P.A.) who prepared the books and records of Caton Lumber and the profit-sharing trust from 1980 until June 30, 1987. Richey was not an employee of Caton Lumber or the profit-sharing trust. In 1987, Caton Lumber's business was failing. The profit-sharing trust was terminated as of June 30, 1987, and Caton Lumber ceased operating in 1988. In the event of the termination of the trust, all funds in the trust vested immediately in the participants in accordance with their respective interests therein. On or about June 30, 1987, Richey prepared a written computation that showed the account balances of the trust participants as well as the loan balances of participants and nonparticipants who had debts owing to the trust as of that date. Richey's computation accurately reflected the status of the accounts and loans of the trust at that time. Richey's computation, however, did not reflect the fact that all accounts became fully vested upon termination of the trust. [5]
*89 For purposes of winding up the business of the company and the profit-sharing trust, the books and records of Caton Lumber were given to Richard S. Karam (Karam), petitioner's counsel in this case. Richey's computation of the profit-sharing trust accounts was included in the records furnished to Karam. Petitioner relied upon Karam to determine the amount each participant was to receive upon liquidation of the profit-sharing trust. None of the participants who had loans outstanding repaid the loans, except through reduction of or offset against his or her vested balances. [6] Instead, each participant's distribution was computed by reducing the vested interest of the participant by the amount of any loans outstanding from the trust to the participant. Petitioner's trust account was treated in a consistent manner with those of the other participants, and his vested interest was reduced by the amount of his outstanding loan balance at the time that the trust was terminated. Final distributions of these net amounts from the profit-sharing trust to participants were made in May or June of 1988. *90 As of June 30, 1987, petitioner owed the profit-sharing trust $ 181,225.41 in principal and unpaid accrued interest on the loans. As of that date, petitioner had a fully vested interest in the profit-sharing trust in the amount of $ 221,468.93. After the offset of petitioner's debt in the amount of $ 181,225.41, petitioner had a vested interest in the amount of $ 40,243.52. After reviewing the documents, Karam told petitioner in 1988 that the notes petitioner had signed for the loans from the profit-sharing trust became unenforceable because the Oklahoma statute of limitations had run. Petitioner was not aware that the statute of limitations might be an issue until Karam discussed it with petitioner in 1988. At the time the profit-sharing trust was terminated in 1987, petitioner believed that he owed the trust a debt in the amount of $ 181,225.41 for the outstanding loans. With his 1987 return, which was received by the Internal Revenue Service (IRS) on August 8, 1988, petitioner attached a financial statement that noted that he had $ 181,225.41 discharge of indebtedness from the profit-sharing trust in 1987 that he claimed was excluded from income due to his insolvency. *91 IRS Audit of the Profit-Sharing Trust
In January of 1989, an IRS agent began an audit of the profit-sharing trust. The IRS agent concluded the audit by September of 1989. Karam had a power of attorney and provided information to the IRS agent with regard to the audit of the trust. The information Karam provided to the agent indicated that, in the process of liquidating the trust, the account balances of petitioner and his brother, as of June 30, 1987, had been reduced by the amount of their respective accrued outstanding loans. The agent determined that the reduction of the account balances by the amount of the outstanding loans was a constructive distribution from the trust to petitioner and his brother during 1987. The agent determined further that the other participants received their distributions in 1988, at which time petitioner and his brother received the remainder of their account balances. The IRS agent also determined that, because Richey had been providing accounting services to the profit-sharing trust, the loan from the trust to Richey was a prohibited transaction under section 4975. Unless the transaction was corrected, Richey would have been subject to *92 the 100-percent penalty imposed on a disqualified person who participates in a prohibited transaction under section 4975(b). On or about June 13, 1988, in order to correct the transaction and avoid application of the 100-percent penalty, petitioner, as a trustee of the trust, assigned the Richey notes to petitioner and his brother. The assignment represented, in part, a distribution to petitioner and his brother in the termination of the trust. The note and related mortgage assigned to petitioner was dated June 6, 1985, and had a face amount of $ 35,000 with interest at the rate of 11 percent per annum. The IRS agent prepared Forms 1099-R reflecting distributions from the profit-sharing trust to petitioner in 1987 in the amount of $ 181,225.41 and in 1988 in the amount of $ 41,854.29 of which $ 39,500 (the $ 35,000 face amount plus accumulated interest of $ 4,500) represented the amount attributable to the Richey note. Petitioner filed the Forms 1099-R on behalf of the profit-sharing trust. [7] Petitioner did not file on behalf of the profit-sharing trust any formal protest challenging the treatment of the writeoff of his loans as a distribution, and the audit of the profit-sharing *93 trust was closed as an agreed case. At the time the Richey note was assigned to petitioner, all of the parties had a reasonable expectation that Richey would pay the debt. During 1988, Richey made an interest payment of $ 4,500 on the note. In the fall of 1988, however, Richey experienced some financial problems, including the filing of a lawsuit against him by his partner and the loss of a Government contract. Finally on October 13, 1989, Richey filed for bankruptcy. On petitioner's 1988 return, petitioner reported only $ 4,500 from the distribution of the Richey note. Petitioner's *94 1987 and 1988 Income Tax Returns
Petitioner filed his 1987 and 1988 returns as married filing separate. Petitioner did not report the $ 181,225.41 offset of the loans from the profit-sharing trust against his vested benefit as income from a distribution from the trust. Instead, in a financial statement attached to his 1987 return, petitioner stated that he was treating the $ 181,225.41 as discharge of indebtedness, excludable from income under section 108(a)(1)(B) due to insolvency. Karam and Richey, with petitioner's assistance, prepared the financial statement attached to petitioner's 1987 return. Petitioner provided Karam with the following figures reflected on the financial statement: ASSETS
Caton-Williams, Inc. (1/8 interest)
$ 12,000
Cash & personal furnishings
3,000
Caton Development Co. (1/2 interest)
6,000
Building -- 300 Willow Place
30,000
Mill Work Building (1/2 interest)
3,000
1982 Datsun pickup
800
Caton Lumber Co. stock (3% interest)
1,000
Jet Lumber Co. bad debt receivable
1,000
Residence (1/2 interest)
25,000
Total assets
$ 81,800
LIABILITIES
Liberty Federal Savings & Loan
John Caton
$ 39,000 Jolynne Vendetti ($ 51,000 liability
in excess of $ 25,000 collateral)
26,000 North West Bank -- unsecured liability on
Caton Lumber Co. note
20,000 Total liabilities
$ 85,000 Net worth
($ 3,200)
*95 Review of the record in this case establishes that petitioner was not insolvent during those years. Petitioner reported income for 1987 as follows: Income 1987 Wages (Caton Lumber)
$ 36,471.06
Interest
987.62
Dividend
5,250.00
Capital gain
655.41
Pension
-0-  Rents
4,733.63
Unemployment compensation
-0-  Gambling winnings
1,600.00
Total income
$ 49,697.72
On Schedule A attached to his 1987 return, petitioner did not report any deductible home mortgage, investment, or personal interest payments. On Schedule B attached to his 1987 return, petitioner reported interest and dividend income in the following amounts from the indicated sources: Type/Source
1987 Amount
Interest
Verlin & Kathern Henthorn
$ 970.05
Liberty Federal S&L
17.57
Dividend
Caton-Williams
5,250.00
On his 1987 return, petitioner reported net rental income in the amount of $ 4,733.63. Petitioner received the rental income in 1987 from three properties designated as Willow Place, Caton Lumber/Mill, and 3517 Forrest Ridge. The net rental income reported on the 1987 return was computed on Schedule E attached to the return, as follows: Willow
Caton
Forrest Item Place Lumber/Mill
Ridge Total
Income
Rents received
$ 7,200.00
$ 4,800.00
$ 1,500.00 $ 13,500.00 Expenses
Mortgage interest
2,158.91 Taxes
2,783.69
311.19
123.03 Subtotal expenses
2,783.69
311.19
2,281.94 5,376.82 Depreciation
2,823.24
566.31 3,389.55 Total expenses
5,606.93
311.19
2,848.25 Income/(loss)
$ 1,593.07
$ 4,488.81
($ 1,348.25)
Profits
6,081.88 Losses
(1,348.25)
Net profit (loss)
$ 4,733.63 *96 Form 4562 attached to the 1987 return indicated that the Forrest Ridge property was a residential rental property placed in service on January 1, 1987, with a depreciable basis of $ 16,250. Petitioner also owned an interest in a concrete block building that was located on East Stanford Street (the Stanford Street property). [8] On his 1987 income tax return, petitioner reported that his interest in the Stanford Street property had been sold on August 19, 1986, in an installment sale for the contract price of $ 10,250. Petitioner reported payment in 1987 of principal in the amount of $ 655.41 from the installment sale of the Stanford Street property. As of December 31, 1987, the unpaid principal balance on the installment sale was $ 9,290.19 ($ 10,250 - $ 959.81). [9]
*97 On petitioner's 1988 Federal income tax return, petitioner reported income as follows: Income
1988
Wages (Caton Lumber)
$ 15,130.24
Interest
919.90
Dividend
5,300.00
Capital gain
724.03
Pension
6,854.29
Rents
6,149.71
Unemployment compensation
985.00
Gambling winnings
-0-  Total income
$ 36,063.17
On Schedule A attached to his 1988 return, petitioner reported personal interest in the amount of $ 439.45, of which $ 175.78 was deductible, and deductible home mortgage interest in the amount of $ 657.09. On Schedule B attached to his 1988 return, petitioner reported interest and dividend income in the following amounts from the indicated sources: Type/Source
1988 Amount
Interest
Verlin & Kathern Henthorn
$ 901.43
Liberty Federal S&L
18.47
Dividend
Caton-Williams
5,300.00
On his 1988 return, petitioner reported net rental income in the amount of $ 6,149.71. The net rental income reported on the 1988 return was computed on Schedule E attached to the return as follows: [10]
Item
Property A
Property B
Property C
Total
Income
Rents received
$ 3,600.00
$ 13,850.00 Expenses
Mortgage interest
3,041.76 Taxes
Subtotal expenses
-0-  4,286.44
Depreciation
-0-  3,413.85
Total expenses
-0-  Income/(loss)
$ 3,600.00
Profits
6,823.45 Losses
(673.74)
Net profit (loss)
$ 6,149.71 *98 On the 1988 return, petitioner reported that, during 1988, he received a payment in the amount of $ 724.03 on the principal of the installment sale of the Stanford Street property. As of December 31, 1988, the unpaid principal balance on the installment sale was $ 8,566.16 ($ 9,290.19 - $ 724.03). In a statement attached to his 1988 return, petitioner explained the discrepancy between the amount of the distribution from the profit-sharing trust reflected on Form 1099-R submitted by Caton'Lumber and the amount reported on his return as follows: Face value of mortgage received in
distribution as reflected on Form 1099-R
$ 39,500
Decrease in face value to fair market value
35,000
Apprised [sic] fair market value of mortgage
amount included on line 17a Form 1040
4,500
*99 Petitioner reported the decrease in the value of the Richey note because the note became uncollectible during 1988. Petitioner's Net Worth
Petitioner substantially understated the value of his assets and overstated the amount of his liabilities in the statement of net worth attached to his 1987 return. In 1987, Caton-Williams, Inc., owned 16 rental properties that had been developed by petitioner's father and a Mr. Williams over the years. Mr. Williams managed the property. Petitioner valued his interest in Caton-Williams, Inc., at $ 12,000. Petitioner, however, received from Caton-Williams, Inc., income in the amount of $ 5,250 in 1987 and $ 5,300 in 1988. [11] In light of the amount of income paid to petitioner by Caton-Williams, Inc., we think the value of the property was substantially greater than the $ 12,000 value reported by petitioner. *100 Petitioner and his brother owned Caton Development Co.Caton Development Co. had owned the concrete block building on East Stanford Street. See supra note 8. The building was sold in 1986 in an installment sale. As of December 31, 1987, petitioner's interest in the installment sale proceeds was $ 9,290.19. Caton Development Co. also owned a rental house that rented for approximately $ 250 per month or $ 3,000 per year. This rent comports with the $ 1,500 that petitioner reported as his half of the rental income from the Forrest Ridge property on his 1987 return. The return indicates that the property was placed in service on January 1, 1987, with a depreciable basis of $ 16,250. On the 1987 return, petitioner deducted $ 566.31 for depreciation, $ 2,281.94 in mortgage interest, and $ 123.03 in taxes attributable to the Forrest Ridge property. The value of petitioner's interest in Caton Development Co. was at least $ 9,290 (the value of petitioner's interest in the installment note) and substantially exceeded the $ 6,000 value reported by petitioner. In 1987, petitioner received gross rents of $ 7,200 from the Willow Place property. [12] He did not deduct any mortgage interest *101 attributable to the Willow Place property. The value of petitioner's interest in the Willow Place property exceeded the $ 30,000 value reported by petitioner. The mill work building was a steel span building that petitioner and his brother had built and rented to the lumber company. In 1987, petitioner received $ 4,800 in gross rent from the property. He did not deduct any mortgage interest attributable to the mill work building. The value of petitioner's interest in the mill work building greatly exceeded the $ 3,000 reported by petitioner. Petitioner, his wife, and John Caton purchased a house at a cost in excess of $ 50,000. Petitioner and his wife paid a $ 10,000 downpayment. The balance was financed by Liberty Federal Savings & Loan. Petitioner and his wife cosigned the note. After the lumberyard closed, John Caton moved out of the house. Petitioner sold the house *102 for $ 8,000 less than the balance on the loan. On his financial statement, petitioner claimed that he was liable for $ 39,000 on this debt. Apparently, petitioner did not deduct the fair market value of the property from the total mortgage in reporting this liability. Petitioner was liable to Liberty Federal Savings & Loan for no more than $ 8,000, the difference between the mortgage liability and the amount realized on the sale. Jolynne Vendetti (Jolynne) is petitioner's daughter. Jolynne lived in a house that was purchased and owned by petitioner and his wife. The house was subject to a mortgage. Jolynne paid the mortgage payments on the house until she lost her job in 1982. After that time, Jolynne moved out of the house, and petitioner and his wife began making the mortgage payments. Petitioner and his wife rented the house and received monthly rental payments that exceeded the monthly mortgage payment by at least $ 5. Petitioner claimed that the property had a fair market value of $ 25,000 and was subject to a $ 51,000 liability. The fact that the monthly rental produced by the property exceeded the monthly payment on the mortgage indicates that the value of the property *103 exceeded the mortgage amount. After Caton Lumber began to have financial problems, suppliers would deliver materials only on a cash-on-delivery basis. Caton Lumber owed one supplier over $ 40,000, and that supplier required a check in that amount before it would deliver materials to Caton Lumber. Petitioner wrote a Caton Lumber check for $ 42,000 or $ 43,000 with the understanding that the supplier would hold the check until Caton Lumber had sufficient funds in the account to cover the check. The supplier, however, immediately deposited the check. The bank honored the check which caused an overdraft of $ 24,000. The bank required petitioner to personally guarantee a loan from the bank to Caton Lumber in the amount of $ 24,000. Caton Lumber paid the entire debt within 6 months, and petitioner was never required to pay pursuant to the guarantee. This debt was not a liability of petitioner's and is not properly included in a calculation of his net worth. Finally, conspicuously omitted from the assets and liabilities listed in the financial statement are petitioner's $ 221,468.93 vested interest in the profit-sharing trust and the amount of petitioner's outstanding debt to the *104 profit-sharing trust, $ 181,225.41. Based on the following figures, petitioner's net worth was in excess of $ 117,334 during 1987: ASSETS
Caton-Williams, Inc. (1/8 interest)
12,000+
Cash & personal furnishings
3,000+
Caton Development Co. (1/2 interest)
9,290+
Building -- 300 Willow Place
30,000+
Mill Work Building (1/2 interest)
3,000+
1982 Datsun pickup
800 Caton Lumber Co. stock (3% interest)
1,000 Jet Lumber Co. bad debt receivable
1,000 Residence (1/2 interest)
25,000 Profit-Sharing Trust
221,469 Total assets
$ 306,559+
LIABILITIES
Liberty Federal Savings & Loan
John Caton
$ 8,000 Jolynne Vendetti house
-0- North West Bank -- unsecured liability on
Caton Lumber Co. note
-0- Loans from Profit-Sharing Trust
181,225 Total liabilities $ 189,225 Net worth
$ 117,334+
During 1987, the value of petitioner's assets exceeded the amount of his liabilities, including the notes to the profit-sharing trust, by at least $ 117,334. Petitioner was not insolvent at any time during the taxable year 1987. OPINION Positions of the Parties[13]
*105 Respondent asserts that, when the profit-sharing trust terminated on June 30, 1987, petitioner offset the amount he was entitled to receive under the profit-sharing trust, $ 221,468.93, by the amount of his outstanding debt to the profit-sharing trust, $ 181,225.41. Respondent further asserts that, as a result of the offset, petitioner received a constructive distribution from the profit-sharing trust in the amount of $ 181,225.41 that was includable in income under section 402(a) and subject to the excess distributions tax under section 4980A. Petitioner contends that his debt to the profit-sharing trust became uncollectible on April 15, 1987, due to the expiration of the State statute of limitations. He asserts that, when the profit-sharing trust terminated, he was entitled to receive his entire vested amount without reduction for the uncollectible demand notes. Petitioner further asserts that, when the other participants' vested amounts were distributed in 1988, he voluntarily and magnanimously elected not to receive his full benefit so that the other participants would not suffer as a result of the discharge of his indebtedness to the trust. [14] Petitioner thus argues that *106 he had discharge of indebtedness income in the amount of $ 181,225.41 excludable from income under section 108 due to insolvency. Since we have found as a fact that petitioner was not insolvent during 1987, the $ 181,225.41 is properly includable in petitioner's income in 1987, either as discharge of indebtedness income or as a constructive distribution from the profit-sharing trust. In light of respondent's determination of an excess distributions tax under section 4980A, we must decide whether the income petitioner received from the cancellation of his debt to the trust in 1987 was from the discharge of the indebtedness, as asserted by petitioner, or a constructive distribution from the profit-sharing trust, as asserted by respondent. We agree with respondent. We are not convinced that petitioner's obligation to repay the loans became uncollectible *107 under Oklahoma law. Furthermore, even if the demand notes evidencing the loans became uncollectible, petitioner's liability was not "discharged" but rather was replaced by his liability as a fiduciary of the trust under the provisions of the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93-406, 88 Stat. 829, 29 U.S.C. sec. 1001 (1988). Oklahoma Law
Petitioner argues that, because the notes evidencing his obligation to repay the loans to the profit-sharing trust were demand notes, under Oklahoma law, the statute of limitations began to run from the date of the loans. Okla. Stat. tit. 12A, sec. 3-122(1)(b) (1963); see also Morgan v. Russell, 189 Okla. 653, 119 P.2d 87 (1941). For the years at issue, the Oklahoma statute of limitations on a written note was 5 years. [15]Okla. Stat. tit. 12, sec. 95 (1988). Petitioner asserts, therefore, that the period of limitations expired on April 15, 1987, at which time the notes became uncollectible. We disagree. *108 In In re 1973 John Deere 4030 Tractor, 816 P.2d 1126, 1129 (Okla. 1991), the Supreme Court of Oklahoma stated that the statute of limitations (Okla. Stat. tit. 12, sec. 95) is an ordinary statute of limitations specifying time periods within which civil actions may be maintained. The statute imposes time limitations on judicial remedies rather than conditions upon substantive rights and operates to extinguish the remedy rather than the substantive right claimed. Id. The statute creates an affirmative defense that vests upon the running of the applicable limitation time period specified in the statute. Id. Unless affirmatively asserted, however, the ordinary statute of limitations defense is deemed waived. Id.
Furthermore, under certain circumstances, the actions of the debtor or the relationship between the debtor and the creditor may limit or prevent the debtor's ability to invoke the statute of limitations defense; the statute of limitations may be tolled or extended. Under Oklahoma law the statute of limitations is tolled if the debtor makes written acknowledgment of existing liability, debt, or claim, no particular form being necessary. Okla. Stat. tit. *109 12, sec. 101 (1988); [16]Baker v. Christy, 172 Okla. 32, 44 P.2d 16 (1935). The record shows that, in the annual accounting, each participant's interest in the profit-sharing trust was determined by reducing the participant's vested amount by the amount of any loans outstanding from the profit-sharing trust to the participant. Petitioner was the trustee and the administrator of the profit-sharing trust and was responsible for preparing the annual statements. We think the annual statements *110 would constitute an acknowledgement of petitioner's debt to the profit-sharing trust, sufficient to extend the statute of limitations under Oklahoma law. See Thompson v. Martin, 138 Okla. 138, 280 P. 589 (1929) (credit given on note, by withholding, at maker's request, maker's share of partnership fund in hands of holder, tolled statute of limitations); Ross v. Lee, 68 Okla. 125, 172 P. 444 (1918) (credit of debt owing by creditor to debtor is sufficient to lift bar of limitations, when made with consent of debtor). Furthermore, although, under Oklahoma law, a right of action barred by the statute of limitations generally is unavailable as either a cause of action or ground of defense (Okla. Stat. tit. 12, sec. 102 (1988)), Oklahoma law provides an exception for counterclaims and setoffs. Oklahoma law provides that: A counterclaim may or may not diminish or defeat the recovery sought by the opposing party. It may claim relief exceeding in amount or different in kind from that sought in the pleading of the opposing party. Where a counterclaim and the claim of the opposing party arise *111 out of the same transaction or occurrence, the counterclaim shall not be barred by a statute of limitation notwithstanding that it was barred at the time the petition was filed, and the counterclaimant shall not be precluded from recovering an affirmative judgment. Where a counterclaim and the claim of the opposing party: 1. Do not arise out of the same transaction or occurrence; 2. Both claims are for money judgments; 3. Both claims had accrued before either was barred by a statute of limitation; and 4. The counterclaim is barred by a statute of limitation at the time that it is asserted, whether in an answer or an amended answer, the counterclaim may be asserted only to reduce the opposing party's claim. Where a counterclaim was barred by a statute of limitation before the claim of the opposing party arose, the barred counterclaim cannot be used for any purpose.
Okla. Stat. tit. 12, sec. 2013.C. (1993). We think that, under Oklahoma law, in an action to compel distribution of a participant's vested account balance by a participant with an outstanding loan at the time of the termination of the profit-sharing trust, the administrator of the profit-sharing trust *112 could have raised a counterclaim or offset in the amount of the outstanding loan. See Stephens v. Household Finance Corp., 566 P.2d 1163 (Okla. 1977); Polin v. American Petrofina Co. of Texas, 589 P.2d 240 (Okla. Ct. App. 1978); Sullivan v. Wheeler, 566 P.2d 160 (Okla. Ct. App. 1977). In the Sullivan case, 566 P.2d at 162, the Oklahoma court, quoting Mulcahy v. Duggan, 67 Mont. 9, 214 P. 1106, 1109 (1923), stated in regard to a suit for an alleged assault and battery and a counterclaim for the alleged libel that provoked the attack: We cannot approve a rule which arbitrarily uses the element of time in determining whether or not various causes of action arise out of the same "transaction." If, as a matter of fact, there is such a connection that the acts complained of were the result of complainant's own acts, we think all causes of action arising therefrom must be litigated in one action. We might add, in passing, that the rule which permits the showing of acts of provocation in mitigation of exemplary damages *113 is of itself a recognition that there is a connection between certain slanders, certain libels, and between certain slanders, libels, and other tortious acts and assaults. Wherever such connection exists they are parts of the same transaction.
Here the record shows that every loan from the profit-sharing trust to a participant in the trust was secured by the participant's vested interest in the trust. None of the participants who had loans outstanding repaid the loans, except through reduction of his or her vested balance. Instead, each participant's final distribution was computed by reducing the vested interest of the participant by the amount of any loans outstanding from the trust to the participant. Every participant in the trust who had a loan outstanding when the trust was terminated received a distribution in an amount equal to the participant's vested amount reduced by the amount of the outstanding debt. Petitioner testified that his trust account was treated in a consistent manner with the accounts of the other participants, and his vested interest was reduced by the amount of his outstanding loan balance at the time that the trust was terminated. We think that *114 the connection that existed between a participant's vested benefit in the profit-sharing trust and any loan made by the trust to the participant was such that they are parts of the same transaction for purposes of the statute of limitations for counterclaims provided in Okla. Stat. tit. 12, sec. 2013.C. (1993). For these reasons, this Court is not convinced that petitioner's debt to the profit-sharing trust became uncollectible during 1987. Furthermore, even if the debt had become uncollectible under Oklahoma law, petitioner would have become personally liable for the debt as a fiduciary of the trust under the provisions of ERISA. ERISA Provisions
The profit-sharing trust was established to operate as a qualified trust described in section 401(a), and the administration of the trust was governed by Oklahoma law only to the extent not governed by the provisions of ERISA and regulations issued thereunder. Therefore, we think a review of applicable ERISA provisions is appropriate. [17]
*115 By enacting ERISA, Congress mandated that the Department of Labor and the Department of the Treasury jointly oversee the participation in and the vesting and funding of pension plans, the reporting and disclosure requirements for pension plans, fiduciary standards, and plan termination insurance. Citrus Valley Estates, Inc. v. Commissioner, 99 T.C. 379, 400 (1992). An important objective of ERISA is to ensure to the greatest extent possible that participants in qualified employer-funded retirement plans actually receive benefits and do not lose their benefits as a result of the failure of the pension plan to accumulate and retain sufficient funds to meet its obligations. H. Rept. 93-807 (1974), 1974-3 C.B. (Supp.) 236, 243; see Citrus Valley Estates, Inc. v. Commissioner, 99 T.C. at 399-400; Vinson & Elkins v. Commissioner, 99 T.C. 9, 15 (1992), affd. 7 F.3d 1235 (5th Cir. 1993). The Court of Appeals for the Tenth Circuit, to which any appeal in this case would lie, has described ERISA as a comprehensive remedial statute designed to *116 protect the interests of participants in employee benefit plans by establishing standards of conduct for fiduciaries of such plans and providing appropriate remedies for breaches of such standards. Eaves v. Penn, 587 F.2d 453, 457 (10th Cir. 1978). Title I (labor title) of ERISA, 88 Stat. 829, 832, 29 U.S.C. secs. 1001-1132 (1988), [18] *117 sets forth standards governing the establishment and operation of pension plans and also establishes general standards of conduct for plan fiduciaries. ERISA section 404(a)(1)(B), 88 Stat. 877, 29 U.S.C. sec. 1104(a)(1)(B) (1988), [19] requires a fiduciary to discharge his duties: with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims * * *.
We think that a prudent *118 man acting as a lender and familiar with loans would not allow the statute of limitations to expire on the note evidencing the loan and cause the debt to become uncollectible. For petitioner to do so, therefore, would constitute a breach of petitioner's fiduciary duty under ERISA section 404(a)(1)(B). That is particularly true here, where it is petitioner's own personal note evidencing his own personal debt to the profit-sharing trust. The obligations imposed by ERISA section 404(a) are supplemented by the provisions of ERISA section 406, 88 Stat. 879-880, 29 U.S.C. sec. 1106 (1988), which prohibit a fiduciary from taking certain actions. ERISA section 406 defines prohibited transactions in which plan fiduciaries are not to engage. ERISA section 406 prohibits a direct or indirect sale or exchange between a retirement plan and its trustee in his individual capacity and, further, forbids a fiduciary from dealing with the assets of the plan in his own interest. Generally speaking, the ERISA section 406 prohibitions are designed to protect against divided loyalties on the part of trustees in dealing with trust assets. NLRB v. Amax Coal Co., 453 U.S. 322, 333-334 (1981). *119 ERISA section 406 has been uniformly interpreted as imposing a per se prohibition of the transactions enumerated. See, e.g., Donovan v. Cunningham, 716 F.2d 1455, 1464-1465 (5th Cir. 1983); M & R Investment Co. v. Fitzsimmons, 685 F.2d 283, 287 (9th Cir. 1982); Cutaiar v. Marshall, 590 F.2d 523, 529 (3d Cir. 1979). The object of ERISA section 406 is "to make illegal per se the types of transactions that experience had shown to entail a high potential for abuse". Donovan v. Cunningham, supra at 1464-1465. ERISA section 406(a) prohibits transactions between a plan and parties in interest. Petitioner is a party in interest to the profit-sharing trust because he is a fiduciary with respect to the trust. ERISA sec. 3(14)(A), 88 Stat. 834, 29 U.S.C. sec. 1002(14)(A) (1988). Subject to certain exemptions, [20] a fiduciary is prohibited from causing the plan to lend money or otherwise extend credit to a party in interest. ERISA sec. 406(a)(1)(B), 88 Stat. 879, 29 U.S.C. sec. 1106(a)(1)(B) *120 (1988). Thus, unless the loans from the profit-sharing trust to petitioner fall within an exception to ERISA section 406, they were prohibited transactions. Certain loans made by the plan to a participant or beneficiary of the plan are exempted from the definition of prohibited transactions. Specifically: Any loans made by the plan to parties in interest who are participants or beneficiaries of the plan if such loans (A) are available to all such participants and beneficiaries on a reasonably equivalent basis, (B) are not made available to highly compensated employees, officers, or shareholders in an amount greater than the amount made available to other employees, (C) are made in accordance with specific provisions regarding such loans set forth in the plan, (D) bear a reasonable rate of interest, and (E) are adequately secured.
ERISA sec. 408(b)(1), 88 Stat. 883, 29 U.S.C. sec. 1108 *121 (b)(1) (1988). During the audit of the profit-sharing trust, the IRS agent apparently determined that the loans from the trust to petitioner were not prohibited transactions. During the trial of this case, petitioner's counsel asserted that the loans from the profit-sharing trust to petitioner were not prohibited transactions. In support of that assertion, petitioner's counsel pointed out that no penalties were assessed on the transaction as a result of the audit of the trust. The Court does not know what records or documents were provided to the IRS agent during the trust audit to support his determination. The record in this case includes copies of the demand notes evidencing the loans, the trust indenture, and the summary plan description. Conspicuously absent from the record is a copy of Caton Lumber's Employee Profit-Sharing Plan. See supra note 2. Based on the record and the positions taken by petitioner in this case, we think that the loans to petitioner did not meet the criteria of ERISA section 408(b)(1). When the profit-sharing trust terminated, each participant's distribution was computed by reducing the vested interest of the participant by the amount of any *122 loans outstanding from the trust to the participant. Petitioner claims that he was entitled to his entire vested benefit in the profit-sharing trust without deduction for the uncollectible notes. If that were the case, then the loans would not have been made available to all participants on a reasonably equivalent basis, and ERISA section 408(b)(1)(A) would not have been satisfied. The record also shows that the loans made to petitioner and Mac Caton were in amounts substantially greater than those made to other employees. As of June 30, 1987, the amount of principal and interest outstanding on loans to petitioner and Mac Caton totaled $ 181,225.41 and $ 161,156.02, respectively. The largest amount outstanding to any other employee was $ 30,050.70. Petitioner and Mac Caton were officers and shareholders of Caton Lumber, as well as co-trustees and administrators of the profit-sharing trust. Thus, the requirement of ERISA section 408(b)(1)(B) was not satisfied. Since the record does not contain a copy of the profit-sharing plan, the Court is unable to determine whether the loans satisfied the requirement of ERISA section 408(b)(1)(C) that the loans be made in accordance with *123 specific provisions regarding such loans set forth in the plan. Similarly, the Court is unable to determine on this record whether 7.5 percent was a reasonable rate of interest, as required under ERISA section 408(b)(1)(D). Although the record shows and the Court has found that the loans were secured by the amount of each participant's vested benefit under the trust, petitioner's counsel argues, to the contrary, that the loans were unsecured. If the loans were not adequately secured, ERISA section 408(b)(1)(E) would not have been satisfied. We think that ERISA section 408(b)(1) provides no exemption for the loans made by the profit-sharing trust to petitioner. Thus, the loans constituted prohibited transactions under ERISA section 406(a). ERISA section 406(b)(1), 88 Stat. 879, 29 U.S.C. sec. 1106(b)(1) (1988), prohibits a fiduciary of a plan from dealing with the assets of the plan in his own interest or for his own account. In Marshall v. Kelly, 465 F. Supp. 341 (W.D. Okla. 1978), the president and sole shareholder of a construction company was a trustee of a profit-sharing plan sponsored by the construction *124 company. As trustee, he caused the plan to lend him money. The loans from the plan and the trustee personally were not exempt from prohibitions of transactions between the plan and parties in interest. The U.S. District Court for the Western District of Oklahoma held that the trustee dealt with plan assets in his own interest in violation of ERISA section 406(b). Similarly, petitioner dealt with the assets of the profit-sharing trust in his own interest in violation of ERISA section 406(b). Violations of the labor provisions contained in ERISA may result in any of a number of sanctions against the fiduciary. Under ERISA section 409(a), 88 Stat. 886, a fiduciary may incur personal liability for any losses suffered by the plan resulting from a breach of duties imposed by ERISA; under ERISA section 502(a)(2), 88 Stat. 891, a civil action for relief under ERISA section 409 may be brought by the Secretary of Labor, by a plan participant, or by a beneficiary. Winger's Dept. Store, Inc. v. Commissioner, 82 T.C. 869, 884-885 (1984). In addition, section 4975, as added to the Internal Revenue Code by Title II of ERISA, parallels the provisions of ERISA *125 section 406(a) and imposes an excise tax on prohibited transactions. [21] It provides that the tax shall be paid by any disqualified person who participates in a prohibited transaction. The tax is imposed at two levels. Section 4975(a) provides for a mandatory initial tax equal to 5 percent of the amount involved with respect to the prohibited transaction. Section 4975(b) imposes an additional tax equal to 100 percent of the amount involved, if the prohibited transaction is not timely corrected. Section 4975(c)(1)(B) provides that, for purposes of the section 4975(a) excise tax, "prohibited transaction" means "lending of money or other extension of credit between a plan and a disqualified person". Loans to participants of a plan may be exempt from the tax on prohibited transactions, if such loans are (A) made available to all participants on a reasonably equivalent basis, (B) are not made available to highly compensated employees in an amount greater than the amount made available to other employees, (C) are made in accordance with specific provisions regarding such loans set forth in the plan, (D) bear a reasonable rate of interest, and (E) are adequately secured. Sec. 4975(d)(1). *126 If, as petitioner asserts, the loans to him from the profit-sharing trust were not secured by his vested benefit or otherwise, then the loans did not satisfy the requirement of section 4975(d)(1)(E). Similarly, if his vested benefit in the profit-sharing trust was not required to be offset by the amount of his loans, then his loan was not made on a reasonably equivalent basis as those made to other participants and the loans did not satisfy section 4975(d)(1)(A). Thus, the loans as described by petitioner would have been prohibited transactions under section 4975. [22] Offsetting the amount of petitioner's debt to the profit-sharing trust against his vested benefit in the trust *127 at the time of the termination of the trust in 1987, however, could be seen as a necessary step in insulating petitioner from the tax on prohibited transactions under section 4975. [23]
*128 Thus, in this case, if the notes evidencing the loans had in fact become uncollectible, petitioner's liability to pay the notes probably would have been replaced by his liability as a fiduciary of the trust under the provisions of ERISA. Petitioner in effect paid his debt to the profit-sharing trust by offsetting the amount of his liability to the trust for the loans against his vested benefit under the profit-sharing trust. Discharge of Indebtedness or Distribution From Trust
The term "discharge of indebtedness" means forgiveness of, or release from, an obligation to repay; it refers to the change in the debtor's financial condition when the debtor is no longer legally required to satisfy his debt either in part or in full. "'Discharge' in this sense can occur only if the creditor cancels or forgives a repayment obligation." United States v. Centennial Savings Bank FSB, 499 U.S. 573, 580-581 n.6 (1991). Discharge does not occur if a debtor's obligation is in exchange for services or is simply replaced with another obligation. 499 U.S. at 581-582 n.7. "Debt discharge that is only a medium for some other form of *129 payment, such as a gift or salary, is treated as that form of payment rather than under the debt discharge rules." Id. (quoting S. Rept. 96-1035 (1980), 1980-2 C.B. 620, 624 n.6, citing sec. 1.61-12(a), Income Tax Regs.). See also Philip Morris, Inc. v. Commissioner, 104 T.C.    ,     (1995) (slip op. at 19-20), where this Court applied Centennial Savings and concluded: We think the teaching of Centennial Savings is clear, namely that the discharge of an indebtedness may be the occasion for the realization of income but, unless there is a cancellation or forgiveness of a portion of the indebtedness not reflected in the terms of the indebtedness, such income is not realized "by reason of the discharge * * * of indebtedness of the taxpayer" (emphasis added) as required by section 108(a). * * *
In this case, the profit-sharing trust did not forgive or release petitioner's obligation to repay the loans; petitioner in effect paid his debt. Petitioner offset the amount of his liability to repay the loan (either as the debtor under the notes or as a fiduciary of the trust) against the amount of his benefit in the profit-sharing *130 trust. The discharge of that liability served as a medium for payment of an equal amount of his vested benefit under the profit-sharing trust. It is as if the trust had distributed the $ 181,225.41 to him, and he in turn had used those funds to pay his debt to the trust. Therefore, the debt discharge is treated as a constructive distribution to petitioner from the profit-sharing trust and is taxable as a distribution. Dean v. Commissioner, T.C. Memo. 1993-226; Minnis v. Commissioner, 71 T.C. 1049, 1056 (1979) (dictum). Excess Distributions Tax
Generally, section 4980A[24] imposes a tax equal to 15 percent of the amount of distributions from a qualified employee plan with respect to any individual during any calendar year to the extent such amount exceeds $ 150,000. Petitioner asserts that he was not liable for the excess distributions tax because there was no distribution. Since we have held that there was a distribution to petitioner from the profit-sharing trust in 1987, respondent is sustained on this issue. *131 Negligence
In the notice of deficiency, respondent determined that, for the taxable year 1987, the entire underpayment of tax was due to negligence or disregard of rules or regulations and, therefore, petitioner was liable for the additions to tax under section 6653(a)(1)(A) and (B). For taxable year 1987, section 6653(a)(1)(A) imposes an addition to tax if any part of an underpayment of income tax is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(1)(B) provides for a separate addition to tax equal to 50 percent of the interest payable under section 6601 on the portion of the underpayment attributable to negligence or intentional disregard of the rules or regulations. Negligence is the lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent's determination of negligence is presumed correct, and petitioner bears the burden of proving otherwise. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); Bixby v. Commissioner, 58 T.C. 757, 791 (1972). *132 Petitioner attached to his 1987 tax return a financial statement that noted that he had received $ 181,225.41 income from the discharge of indebtedness which he claimed was exempt from tax under section 108 due to his alleged insolvency. Petitioner was not insolvent at the time of the "discharge" of his debt. On that financial statement attached to his 1987 return, petitioner greatly undervalued his assets and greatly overstated his liabilities, matters that were peculiarly within his personal knowledge. Although petitioner relied on his present counsel for the legal theory that was advanced on the return and at trial, nonetheless it was petitioner who supplied the factual foundation on which the theory was erected. Accordingly, the entire underpayment of tax is due to petitioner's negligence and intentional disregard of rules or regulations. Respondent is sustained on the additions to tax under section 6653(a)(1)(A) and (B). Substantial Understatement of Income Tax
Respondent also determined an addition to tax under section 6661 for a substantial understatement of income tax for the taxable year 1987. Section 6661 provides for an addition to tax of 25 percent of the *133 amount of the underpayment of tax attributable to a "substantial understatement of income tax". A substantial understatement is defined as an amount that exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). Petitioner reported total tax in the amount of $ 12,111 and understated his tax in the amount of $ 65,879. Therefore, there was a substantial understatement of tax. The understatement, and hence the addition to tax, will be reduced if the taxpayer's treatment of an item at issue was based upon substantial authority or if the relevant facts relating to the tax treatment of that item were adequately disclosed on the return or in a statement attached thereto. Sec. 6661(b)(2)(B)(i) and (ii). Petitioner does not come within either of the provisions that permit a reduction of the amount of the understatement. Petitioner failed to include the $ 181,225.41 in his income. Petitioner's claim of insolvency was baseless. There is no substantial authority for petitioner's failure to include the $ 181,225.41 in income. Furthermore, petitioner did not adequately disclose his assets and liabilities. The mere filing of the financial *134 statement with the tax return did not serve to disclose the underlying facts and true nature of petitioner's claimed insolvency. See Schirmer v. Commissioner, 89 T.C. 277, 284-286 (1987). [25] The Court sustains the addition to tax for substantial understatement of income tax for the taxable year 1987.
Amount of Deficiency
In the notice of deficiency respondent determined that the amount of the distribution petitioner received from the profit-sharing trust in 1987 was $ 165,350. The evidence establishes and we have found that petitioner received a distribution in 1987 in the amount of $ 181,225.41. Respondent, however, has not claimed an increased deficiency, [26] and this Court will not redetermine a higher amount. Sec. 6214(a); *135 Estate of Petschek v. Commissioner, 81 T.C. 260, 271-272 (1983), affd. 738 F.2d 67, 69 (2d Cir. 1984); Koufman v. Commissioner, 69 T.C. 473, 475-476 (1977). To reflect the above holdings and respondent's concession, Decision will be entered for respondent for the taxable year 1987 and for petitioner for the taxable year 1988.
Footnotes
1. Includes an excess distributions tax under sec. 4980A↩ in the amount of $ 2,303. 2. 50 percent of the interest due on $ 65,879. ↩
1. The shares not held directly by petitioner or his brother were held in trust by their mother for their benefit.↩
2. The Caton Lumber Company Profit-Sharing Plan Trust Indenture (the trust indenture) is an exhibit in this case. By separate instruments, an Employee Profit-Sharing Plan (the plan) and an adoption agreement were executed and adopted concurrently with the trust indenture. All three instruments were to be construed and operate as one. The version of the trust indenture that is in evidence is one executed by petitioner and his brother on Aug. 14, 1986. The plan and the adoption agreement, however, were not offered into evidence and are not part of the evidentiary record in this case. There is in evidence a Summary Plan Description; this is not, however, the plan but a partial summary prepared by the profit-sharing trust for the participants. That summary is a nontechnical explanation of some aspects of the plan but is not helpful in determining the terms of the plan.↩
3. In some instances, however, the amount owed by a participant may have exceeded his or her vested interest in the profit-sharing plan.↩
4. Petitioner invested some of the borrowed funds in a "truss" business, anticipating that the business would be profitable and that he would be able to repay his loans from those profits. The truss business, however, was unsuccessful, and the money petitioner invested was lost.↩
5. Sec. 411(d)(3)↩ provides that, in the event of a termination of a qualified plan, the rights of affected employees to benefits accrued to the date of termination shall be nonforfeitable, to the extent the plan is funded, as of the date of termination.
6. Petitioner's counsel, Richard S. Karam, attempted to lead petitioner to state and the Court to conclude that other participants repaid their loans. However, petitioner's testimony as a whole and the other evidence in the record show that participants did not repay their loans except through an offset against their vested amounts.↩
7. Petitioner did not agree with the IRS agent's determination that the writeoff of his loan balances as of June 30, 1987, was a constructive distribution, but he filed the Form 1099-R for 1987 in order to close the audit. If petitioner had not filed the Form 1099-R, the agent would have had to close the audit as unagreed. In such event, the case would have been sent to a higher authority within the IRS for a determination.↩
8. Although petitioner seemed to suggest at trial that Caton Development Co. owned the Stanford Street property, he did not attribute the gain on the sale of the property to Caton Development Co. on his 1987 and 1988 returns.↩
9. On his 1988 return, petitioner reported that, in prior years, he had received $ 959.81 of principal on the installment sale of the Stanford Street property. However, the Form 6252 for 1987 had indicated no payment in the year of sale (1986), so possibly the unpaid balance was as high as $ 9,594.59 ($ 10,250-$ 655.41).↩
10. "Page 2 of 2" is handwritten at the top and bottom of the Schedule E attached to petitioner's 1988 return. Page 1 of 2 was not included in the copy of petitioner's 1988 return stipulated into evidence as Exhibit 2-B in this case.↩
11. Petitioner testified that he received only $ 1,400 from the Caton-Williams property in 1987 because Mr. Williams stole the cash from the corporation. Petitioner, however, reported that he had received $ 5,250 as dividend income from Caton-Williams on his 1987 income tax return and $ 5,300 on his 1988 return; it was not reported as income passed through from an S corporation, which would have been reportable even if not paid. Petitioner's contradictory testimony was an attempt to prove he was insolvent on June 30, 1987.↩
12. At trial, petitioner testified that the property rented for only $ 200, the amount he claimed he was receiving at the time of the trial.↩
13. The parties have not raised the issue of the application of sec. 72(p) enacted by sec. 236 of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, 96 Stat. 324, 509. Sec. 72(p) is applicable to loans from a qualified plan to participants of the plan which are made, renegotiated, extended, revised, or renewed after Aug. 13, 1982. Except for loan amounts that fall within the limitations of sec. 72(p)(2), loans made from a qualified plan to a participant or beneficiary of the plan are treated as taxable distributions from the plan. Sec. 72(p)(1)(A). Prior to Aug. 13, 1982, loans from qualified plans were not taxable distributions. See H. Conf. Rept. 97-760 (1982), 1982-2 C.B. 600↩, 671-672.
14. Petitioner asserted that the other participants received their full vested amounts without reduction for their debts to the profit-sharing trust. That is not the case.↩
15. Effective Jan. 1, 1992, Okla. Stat. tit. 12A, sec. 3-118(b) provides: If demand for payment is made to the maker of a note payable on demand, an action to enforce the obligation of a party to pay the note must be commenced within six (6) years after the demand. If no demand for payment is made to the maker, an action to enforce the note is barred if neither principal nor interest on the note has been paid for a continuous period of ten (10) years.
Prior to the enactment of Okla. Stat. tit. 12A, sec. 3-118(b), the 5-year limitation on a written note provided in Okla. Stat. tit. 12, sec. 95↩ applied to promissory notes.
16. Okla. Stat. tit. 12, sec. 101 (1988) provides: In any case founded on contract, when any part of the principal or interest shall have been paid, or an acknowledgment of any existing liability, debt or claim, or any promise to pay the same shall have been made, an action may be brought in such case within the period prescribed for the same, after such payment, acknowledgment or promise; but such acknowledgment or promise must be in writing, signed by the party to be charged thereby.↩
17. At the trial of this case, the Court requested that the parties thoroughly address ERISA and in particular the prohibited transaction rules. In his brief, petitioner acknowledged the Court's request, but stated that "no ERISA issue was identified in Petitioner's research". The Court's research has identified several provisions of ERISA pertinent to this case.↩
18. For convenience, citations generally will be made to the Statutes at Large and the United States Code the first time reference is made to an ERISA section and not thereafter.↩
19. The Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93-406, sec. 404(a)(1), 88 Stat. 829, 877, 29 U.S.C. sec. 1104(a)(1) (1988), provides that: a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and -- (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title.↩
20. ERISA sec. 406(a) expressly provides that its prohibitions are subject to the exemptions provided in ERISA sec. 408.↩
21. The IRS agent who conducted the audit of the profit-sharing trust in 1989 did not assert the penalty under sec. 4975, and respondent has not asserted the penalty in this case. We discuss sec. 4975↩ solely for the purpose of determining whether petitioner's debt to the profit-sharing trust was cancelled or replaced by another liability.
22. On brief, respondent stated that the IRS agent who conducted the audit of the profit-sharing trust determined that the loans to petitioner fell within the exemptions provided in sec. 4975(d) and were not prohibited transactions under sec. 4975(c)↩. Such determination does not consider the fact that the amount of the loans from the profit-sharing trust to petitioner greatly exceeded the amounts to other participants and that petitioner now claims the loans were not secured and were uncollectible.
23. On brief, respondent asserts that the IRS agent who audited the profit-sharing trust may have treated the offset of the loans in 1987 as a correction of the prohibited transaction. The IRS agent prepared, and petitioner filed on behalf of the profit-sharing trust, a Form 1099-R showing a distribution to him in 1987 of $ 181,225.41, the amount of principal and interest he owed to the trust; that amount was not actually paid to petitioner but his debt to the profit-sharing trust was treated as paid. The audit of the profit-sharing trust was thereupon closed. Petitioner now tries to repudiate the position he took during the trust audit.↩
24. This provision was originally designated sec. 4981A by sec. 1133(a) of the Tax Reform Act of 1986 (TRA 1986), Pub. L. 99-514, 100 Stat. 2085, 2481, and was redesignated as sec. 4980A↩ by sec. 1011A(g)(1)(A) of the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, 102 Stat. 3342, 3479, effective as if included in the provisions of TRA 1986.
25. See also Hamdi v. Commissioner, T.C. Memo. 1993-38, affd. without published opinion 23 F.3d 407 (6th Cir. 1994); Horwich v. Commissioner, T.C. Memo. 1991-465↩.
26. Moreover, the difference between the two amounts represents the interest paid on the debt to the trust, and in 1987 most of that interest would have been deductible personal interest.↩